## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **ANTONIO HOLLEY, JR.,** | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **CIVIL ACTION NO. 23-4670** |
| | : | |
| **COMMUNICATION TEST** | : | |
| **DESIGN, INC.,** *et al.*, | : | |
| **Defendant.** | : | |

### MEMORANDUM

**KENNEY, J.**                                                                 **June 30, 2025**

### I.      INTRODUCTION

In this employment action, *pro se* Plaintiff Antonio Holley ("Plaintiff" or "Holley"), an African American individual, alleges that his former employer Communications Test Design, Inc. ("CTDI") discriminated and retaliated against him due to his race.  Discovery is now complete, and CTDI moves for summary judgment as to each of Holley's claims.  Upon consideration of CTDI's Summary Judgment Motion (ECF No. 30, "Mtn."), Holley's Response in Opposition (ECF No. 34, "Opp."), CTDI's Reply (ECF No. 35, "Reply"), Holley's Surreply (ECF No. 38, "Surreply"), and the undisputed factual record before the Court, for the reasons set forth below, CTDI's Motion (ECF No. 30) is **GRANTED**.

### II.     LEGAL STANDARD

#### A.      Summary Judgment Standard

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Indeed, "[s]ummary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Mann v. Palmerton Area Sch. Dist.*, 872 F.3d 165, 170 (3d Cir. 2017), *as amended* (Sept. 22, 2017) (internal quotations omitted) (quoting *Wright v. Owens Corning*, 679 F.3d 101, 105 (3d Cir. 2012)). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). If "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," there exists a genuine issue of material fact. *Id.* It is incumbent upon the party moving for summary judgment to "inform[] the district court of the basis for its motion, and identif[y] those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (cleaned up).

The party opposing summary judgment must demonstrate more than the "mere existence of a scintilla of evidence" to defeat summary judgment. *Anderson*, 477 U.S. at 252. Likewise, "a plaintiff cannot rely on unsupported allegations, but must go beyond pleadings and provide some evidence that would show that there exists a genuine issue for trial," *Jones v. United Parcel Serv.*, 214 F.3d 402, 407 (3d Cir. 2000), as arguments made in the briefing "are not evidence and cannot by themselves create a factual dispute sufficient to defeat a summary judgment motion." *Jersey Cent. Power & Light Co. v. Lacey Twp.*, 772 F.2d 1103, 1109–10 (3d Cir. 1985).

To determine whether a genuine issue of material fact exists, the court must "examine the evidence of record in the light most favorable to the party opposing summary judgment, and resolve all reasonable inferences in that party's favor." *Wishkin v. Potter*, 476 F.3d 180, 184 (3d Cir. 2007). The ultimate question for the Court to decide is whether "a fair-minded jury could return a verdict for the plaintiff on the evidence presented." *Anderson*, 477 U.S. at 252. "Where

the record taken as a whole could not lead a rational trier of fact to find for the non-moving party,"

the court should grant summary judgment, as "there is no genuine issue for trial." *Matsushita*

*Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (cleaned up).

B.    **Summary Judgment Filing Requirements**

Under Federal Rule of Civil Procedure 56(c), litigants are directed to support their factual

positions as follows:

> (1) ***Supporting Factual Positions***. A party asserting that a fact cannot be or is genuinely
> disputed must support the assertion by:
>> (A) citing to particular parts of materials in the record, including depositions,
>> documents, electronically stored information, affidavits or declarations,
>> stipulations (including those made for purposes of the motion only), admissions,
>> interrogatory answers, or other materials; or
>> (B) showing that the materials cited do not establish the absence or presence of a
>> genuine dispute, or that an adverse party cannot produce admissible evidence to
>> support the fact.
>
> ***
>
> (3) ***Materials Not Cited.*** The court need consider only the cited materials, but it may
> consider other materials in the record.
>
> (4) ***Affidavits or Declarations.*** An affidavit or declaration used to support or oppose a
> motion must be made on personal knowledge, set out facts that would be admissible in
> evidence, and show that the affiant or declarant is competent to testify on the matters stated.

Fed. R. Civ. P. 56(c).  Further, under Rule 56(e), "[i]f a party fails to properly support an

assertion of fact or fails to properly address another party's assertion of fact as required by Rule

56(c), the court may . . . consider the fact undisputed for purposes of the motion."  Fed. R. Civ. P.

56(e)(2).

C.    **Holley's Opposition Viewed in the Light of his *Pro Se* Litigant Status**

Although the filings of *pro se* litigants are to be construed liberally by the courts, *see*

*Morrison v. Rochlin*, 778 F. App'x 151, 153 (3d Cir. 2019), *pro se* litigants "cannot flout

procedural rules—they must abide by the same rules that apply to all other litigants."  *Mala v.*

*Crown Bay Marina, Inc.*, 704 F.3d 239, 245 (3d Cir. 2013) (citing *McNeil v. United States*, 508

U.S. 106, 113 (1993)).  At the summary judgment stage, a *pro se* plaintiff need still "comply with

the procedures outlined in Rule 56 of the Federal Rules of Civil Procedure." *Bello v. Romeo*, 424 F. App'x 130, 133 (3d Cir. 2011).

Here, CTDI represents to the Court that "no Concise Statement of Stipulated Material Facts . . . have been agreed upon by the parties," though "[t]he parties met and conferred on January 16, 2025." ECF No. 30-3 at 1. Defendant submitted a "Statement of Additional Facts" consisting of 25 pages and 178 paragraphs with citations to sworn declarations, document exhibits, and Holley's deposition testimony. *See generally* ECF No. 30-4 ("Statement of Additional Facts" or "SOAF").

Holley did not submit a statement of additional facts. Instead, in response to Defendant's filing, Holley submitted with his opposition memorandum a "paragraph-by-paragraph rebuttal with exhibit references." *See* Opp. at 23–28. In this response, Plaintiff fabricated six statements he attributes to CTDI. *Id.* Those alleged statements cannot be found anywhere in the summary judgment record, and one could surmise they were AI creations. Plaintiff, in responding to those fabricated statements, creates a virtual reality that does not exist. The Court will not be drawn into a review of this virtual reality.

Ultimately, Plaintiff's "responses" to the 178 paragraphs in Defendant's Statement of Additional Facts shed no more light on the additional facts presented by CTDI, nor do they offer additional facts to support his own case.[1] Therefore, Defendant's Statement of Additional Facts is "undisputed for purposes of the motion." Fed. R. Civ. P. 56(e); *see also Smith v. City of Atl.*

---

[1] The Court identifies five "issues" that Plaintiff expressly claims constitute "key disputes" or "genuine issues of material fact": (1) "unequal enforcement of attendance policies"; (2) "improper HR handling of protected complaints"; (3) "[w]hether Plaintiff's shift was changed in retaliation for his complaints"; (4) "[w]hether the stated reasons for termination were pretextual"; and (5) "[w]hether comparators were treated more favorably for similar or worse conduct." *See* Opp. at 32; Surreply at 3. In deciding this Motion, the Court has mined the record to determine whether any such genuine disputes of material fact exist, and, for the reasons discussed below, finds that there are none.

*City*, 138 F.4th 759, 777–78 & n.8 (3d Cir. 2025) (recognizing Federal Rule of Civil Procedure 56(e)(2)'s applicability to facts not "meaningfully disput[ed]").

III.    **FACTS**

A.    **Early Years at CTDI**

Holley began working at CTDI, an "engineering, repair, and logistics company," in December 2013 at its West Chester, Pennsylvania location.  SOAF ¶¶ 1, 4.  Though he was originally assigned the second shift, which encompassed the hours of "roughly 2:00 p.m. to 10:00 p.m.," from 2016 through 2020, *see id.* ¶¶ 5, 6, Holley also worked the mid shift and second shift at various CTDI locations, including those in Exton, Pennsylvania, and Coatesville, Pennsylvania. *Id.* ¶¶ 6, 7.  CTDI also operated facilities in Swedesboro, New Jersey, and Logan, New Jersey.  *Id.* ¶ 3.  Throughout his employment, Holley's records indicated that he resided at 313 West Eighth Street, Chester, PA 19103—the address on his driver's license—though he testified during his deposition that he "lived at various addresses" during his employment with CTDI.  *Id.* ¶¶ 23–24; CTDI SJ Ex. 1 (ECF No. 30-12 at 23).

During Holley's employment with CTDI, the Company maintained an "Employee Handbook" containing the company's policies and procedures.  SOAF ¶ 25.  Included in the handbook were various policies outlining time recording, attendance expectations, employee address maintenance, and employee discipline procedures.  *Id.* ¶¶ 25–38.  The handbook also included a policy on "Workplace Commitments," which covered CTDI's "equal employment opportunity [policy][,] anti-harassment [policy][,] and complaint procedure."  *Id.* ¶ 28.  Holley received a copy of the Handbook upon commencement of his employment and reviewed the Handbook throughout his tenure with the company.  *Id.* ¶ 26.

Less than two years into his role with CTDI, on June 5, 2015, Holley received a "First Warning – Attendance" after incurring "three attendance violations from March 12, 2015 through June 4, 2015." *Id.* ¶ 39. These attendance issues arose again in late 2016 and continued through early 2017, when Holley was issued another "First Warning" for attendance on February 16, 2017 after being late to work on twenty occasions between November 28, 2016 and February 10, 2017. *Id.* ¶¶ 40–41. About a year later, on January 5, 2018, Holley received a "Final Warning" for "failing to provide notice of absence" after failing to report to work on December 29, 2017, although Holley testified that he had alerted a co-worker of the absence in advance. *Id.* ¶¶ 43–46; CTDI SJ Ex. 13 (ECF No. 30-12 at 210).

### B. Internal Transfer to the West Chester Facility

At some time near August 20, 2020, Holley interviewed for an internal transfer from CTDI's Coatesville location back to CTDI's West Chester location with supervisors Angelo Cavuto ("Cavuto") and Paul Thompson ("Thompson"). *Id.* ¶ 9. Holley was soon thereafter hired to work mid shift hours, from 12:00 p.m. to 8:00 p.m., as an international shipping clerk in Building 1373 of CTDI's West Chester facility. *Id.* ¶ 10.

While working at the West Chester facility, Cavuto served as Holley's direct supervisor, though Holley also received work assignments from Thompson. *Id.* ¶¶ 11, 16. Both Cavuto and Thompson reported to Thomas Young ("Young"), the "Branch Manager" in charge of the West Chester facility's operations. *Id.* ¶¶ 18–19. Cavuto and Thompson each worked first shift, which overlapped with Holley's assigned mid shift until 3:30 p.m. but left Holley without supervision from 3:30 p.m. to 8:00 p.m. *Id.* ¶ 17.

C.    **Disciplinary Infractions and Move to First Shift**

Once employed in the West Chester facility, Holley's struggle with punctuality was apparent, with Holley arriving late to his mid shift due to self-proclaimed "traffic" and "childcare" obligations. *Id.* ¶¶ 47–49. Then, on June 15, 2021—less than a year after his internal transfer—Holley received a "Final Warning" regarding his work conduct from Mr. Young for "repeatedly" leaving his post "without authorization for extended periods" and failing to notify superiors that he was being paid for hours he was not present on both June 1, 2021 and June 3, 2021. *Id.* ¶¶ 50–56. Although Holley testified that he recalled being written up for taking an "extended break" in June 2021, he stated that the break was due to his cousin's passing. *Id.* ¶¶ 53–55.[2]

About two months later, on August 30, 2021, Holley alerted Cavuto that he would be four hours late to his shift the following day. *Id.* ¶ 59. Cavuto responded that Holley had been late to eight of his ten shifts in the prior two weeks and emphasized that he "need[ed]" Holly there "on time every day without exception." *Id.* ¶ 60. Holley replied only that he "sent an email before [he] went back to the 12-8 shift stating [that] some Tuesday[s] and Wednesday[s] [he'd] be late," and that he had requested to be switched to the 2:00 p.m. to 10:00 p.m. shift for "babysitting purposes." *Id.* ¶ 61. In the month following this warning, Holley arrived late to around 19 out of his 22 shifts, though he endeavored to stay later those days to make up his lost time. *Id.* ¶¶ 87–88.

On September 3, 2021, an incident took place in which Holley left his work post for an extended period. *Id.* ¶ 63. After learning of the incident, Young informed an HR representative, Lindsey Ackell ("Ackell"), who communicated with the "corporate campus security manager," Mr. Edward Gomez ("Gomez"), to determine the length of Holley's absence. *Id.* ¶¶ 64–72. Upon

---

[2] Plaintiff further admitted in his deposition that he sometimes took breaks that were over an hour long. *See* SOAF ¶ 58.

Gomez's review of security footage, it was revealed that Holley left the premises at 4:39 p.m. and returned at around 8:11 p.m. *Id.* ¶ 73.  Holley testified that he had not left CTDI's West Chester facility via vehicle until around 5:00 p.m., as he was "using CTDI's Wi-Fi to conduct bids on a raffle in aid of his informal side-business collecting, selling, buying, and trading shoes." *Id.* ¶ 86.

Both Young and Ackell reviewed the security footage themselves, confirmed Holley's misconduct, and Young conveyed the information to Jodi Colello ("Colello"), a "CTDI senior manager in employee relations." *Id.* ¶ 76.  It was then that Young recommended to Colello, given Holley's prior final warning for leaving the premises without permission in June 2021, that Holley's employment be terminated.  *Id.* ¶ 77.

Ultimately, Colello opted to have Young issue Holley a "Review of Final Warning for Work Conduct" instead of pursuing termination.[3]  *Id.* ¶ 78.  In response, Young requested that Holley be moved from mid shift to first shift so his entire shift could be supervised.  *Id.* ¶ 79.  During the "Review of Final Warning for Work Conduct" meeting with Holley on November 9, 2021, Plaintiff testified that Young told him that "[i]f it was [sic] up to me, [you would be] fired.  So you need to thank whoever saved you." *See* CTDI SJ Ex. 1 (ECF No. 30-12 at 86–88); *see also* SOAF ¶¶ 80–84.  Holley was then moved to first shift with scheduled working hours from 7:00 a.m. to 3:15 p.m.  SOAF ¶ 89.  Following Holley's move, CTDI did not re-fill the prior mid shift position, nor did it hire for the second shift, as the tasks that warranted the shift were no longer present in Building 1373 past 3:30 p.m.[4]  *Id.* ¶¶ 93–94, 130.

---

[3] Holley testified that, per his understanding of CTDI's employee handbook, he believed that he would be terminated after his June 2021 Final Warning. *See id.* ¶ 83.

[4] In his Surreply, Holley appears to dispute CTDI's purported reason for removing him from the mid shift by arguing that "the work did not move until 6–8 months later." Surreply at 2.  Aside from providing no record evidence supporting this point, Holley's surreply mischaracterizes CTDI's argument.  CTDI does not assert that it moved Holley from the mid shift because the work no longer existed.  Instead, it argues that Holley was moved to first shift so his supervisors could

Holley's punctuality did not improve with the move to first shift; instead, he was late "probably every day" in January and February of 2022 due to his babysitting obligations. *Id.* ¶¶ 95–97. Holley testified that he "didn't have to" look for babysitters available in the morning hours because he "had a babysitter," and did not "want to send [his] child to a child care center," as he "didn't trust" anyone "with [his] child other than the people [he] trusted." CTDI SJ Ex. 1 (ECF No. 30-12 at 94–98). These individuals included his grandmother and sister, who could only babysit after 12:00 p.m., and his girlfriend's mother, who he testified babysat "once [he] switched to 7 a.m.," from 6:30 a.m. to 4:00 p.m. CTDI SJ Ex. 1 (ECF No. 30-12 at 98, 165–66).

Although Holley testified that he had access to childcare during his morning shift, he continued to incur attendance violations on account of "childcare issues," amassing 13 violations between January 25, 2022 and February 15, 2022. SOAF ¶¶ 101, 105. On February 15, 2022, Cavuto issued Holley a "First Warning" for these 13 infractions, and on February 28, he issued a "Second Warning" for an additional five infractions. *Id.* ¶¶ 101, 104. At this time, Holley was aware that only two more infractions in "the following six months would result in the issuance of a final warning." *Id.* ¶ 106.

D.    **Plaintiff's Complaints and Offers to Transfer**

1.    *March 1, 2022 Complaint*

Holley approached Colello with his first complaint on March 1, 2022 via e-mail. *Id.* ¶ 107. In his e-mail, Holley stated that "[t]here were two incidents in June and September of 2021 for which I received disciplinary action. Since then[] I have been targeted and put in a situation that seems as though it is meant to cause me to be terminated." *Id.* Specifically, Holley alleged that

---

oversee the entirety of his shift. *See, e.g.*, SOAF ¶ 90. Even assuming that there exists a genuine dispute on this point, the Court does not find it material.

he was being retaliated against for the June 2021 and September 2021 incidents in which Holley left his post for extended periods of time, subjected to a hostile work environment, and expressed his belief that his move from mid shift to first shift was racially charged.  *Id.* ¶ 108.

Holley has consistently maintained his belief that his transfer from mid to first shift was racially motivated based on emails he accessed in a shared inbox between his immediate predecessor, Nate Johnson ("Johnson")—a white male—and Thompson from 2019 through 2020. *Id.* ¶¶ 109, 119.[5]  According to Holley, the emails between Johnson and Thompson evidenced that Johnson received accommodations due to his nursing school schedule, while Holley did not receive the same accommodations for his childcare schedule.  *Id.* ¶¶ 109–11.  Holley further

---

[5] Holley filed various emails chains between Johnson and Thompson as standalone exhibits on the docket on December 26, 2024.  *See* ECF No. 29.  To ensure that the instant opinion adequately reflects the record, the Court conducted a thorough review of each document provided by both Holley and CTDI.  First, in January 2019, Johnson emailed Thompson alerting him that he'd be "coming in early tomorrow so I can make up time/finish viavi."  Holley SJ Ex. 5I (ECF No. 29-17 at 1).  Then, in April 2019, Thompson emailed Johnson admonishing him to "make sure you are at 40 hours as Angelo will be doing your time."  Holley SJ Ex. 5A (ECF No. 29-10 at 1).  Later that year, in July 2019, Thompson alerted Johnson that he "added an hour to everyday this week to cover the OT you are working."  Holley SJ Ex. 5C (ECF No. 29-11 at 1).  A month later, in August 2019, Johnson alerted Thompson and Cavuto that he would be unable to come in to work on Wednesdays for a period of six weeks, leading Thompson and Cavuto to discuss whether permitting the scheduling change would be feasible given Johnson's workload.  *See* Holley SJ Ex. 5D (ECF No. 29-12 at 1).  In December 2019, Thompson alerted an Andy Spence and Cavuto that "Nate just called and said he would be an hour late today and would Make the time up tonight."  Holley SJ Ex. 5E (ECF No. 29-13 at 1).  A handful of months later, in a February 27, 2020 email between Johnson and Thompson, Thompson admonished Johnson that he "need[ed] [him] to start making it [to work] on time everyday [sic]," as he "[s]eem[ed] to be a few minutes late a lot," and "[t]hey are gonna [sic] start cracking down on Lates."  Holley SJ Ex. 5F (ECF No. 29-14 at 1); *see also* CTDI SJ Ex. 25 (ECF No. 30-12 at 251).  Johnson offered to "us[e] vacation in half-hour [] intervals so it is not seen as late," as his schedule conflicted with nursing school.  Holley SJ Ex. 5F (ECF No. 29-14 at 1); *see also* CTDI SJ Ex. 25 (ECF No. 30-12 at 251); SOAF ¶ 121.  In response, Thompson suggested that Johnson change his shift start time from 2:00 p.m. to 2:30 p.m.  Holley SJ Ex. 5F (ECF No. 29-14 at 1); *see also* CTDI SJ Ex. 25 (ECF No. 30-12 at 251).  In two email chains from early April 2020, Thompson also alerted Johnson as to missed punches.  *See* Holley SJ Exs. 5G (ECF No. 29-15 at 1); Holley SJ Ex. 5H (ECF No. 29-16 at 1).  As discussed *infra* Section V.A.2, Johnson is not a proper comparator to Holley, and these documents do not create a genuine dispute of material fact.

alleged that Johnson received "courtesies" in his timekeeping that he was not afforded,[6] *id.* ¶ 115, and that he saw Johnson leave his post without prior approval.[7] *Id.* ¶ 117.  However, Johnson had no disciplinary history with the company.  *Id.* ¶ 120.

As to his complaint of retaliation, Holley claimed to Colello that his move to first shift was retaliatory because when he "asked again why [his] schedule could not be changed," his supervisor told him the move "was in response to the disciplinary action [Holley] received previously."  *Id.* ¶¶ 112–13; CTDI SJ Ex. 2 (ECF No. 30-12 at 171).  Holley claimed that this reasoning was "a clear indication of retaliation," because he "should not be continuously penalized for incidents that happened several months ago."  CTDI SJ Ex. 2 (ECF No. 30-12 at 171).  In his email to Colello, Holley further referenced Young's November 9, 2021 comment that, had it been up to him, Holley would have been terminated from his position.  *Id.*; SOAF ¶ 84.  Colello responded to Holley within ten minutes, acknowledging Holley's concerns and stating that she would ask Ackell, in her position as Senior Regional Human Resources Manager, to investigate.  CTDI SJ Ex. 2 (ECF No. 30-12 at 171).  That same morning, Colello directed Ackell to have Paula Morales ("Morales"), an HR representative, investigate Holley's complaint.  *Id.* (ECF No. 30-12 at 170).

### 2. *March 7–8, 2022 Complaint*

Morales contacted Holley within a week of his initial complaint on March 7, 2022 to offer two second shift positions at CTDI's Coatesville location or in the 1305 Building in West Chester.  SOAF ¶ 124.  Plaintiff refused the shifts, as the Coatesville position presented too lengthy of a

---

[6] Holley admitted in his deposition that he was extended such a courtesy by Thompson in October 2021 when Thompson emailed Holley alerting him that he "did not punch in and [his] hours [were] all over the place" and that "[s]tarting next week [Thompson] expect[s] [Plaintiff] to be punched in and out on time."  SOAF ¶ 116.

[7] Thompson, Cavuto, and Young each attest that they were not aware of such conduct by Johnson.  SOAF ¶ 118.

commute from where he was residing at the time, and the opening in the 1305 Building required him to take a pay cut due to a position change.  *Id.* ¶¶ 125–27.  On March 8, Holley responded to Morales's email and reiterated his retaliation and hostile work environment concerns, clarifying that his hostile work environment concerns "stem[med] from [his] belief that this schedule change did not come from [Human Resources], but instead was placed into effect by [his] manager in an attempt to continuously punish [him] for a matter that has already been addressed."  CTDI SJ Ex. 20 (ECF No. 30-12 at 230).  By the time of this email, Morales was under the impression that Holley had retracted his March 1 complaint during a conversation on March 7, 2022 after Morales explained to Holley that Human Resources was involved in the shift change.  CTDI SJ Ex. 20 (ECF No. 30-12 at 229).  Ultimately, Morales did not respond to Holley's March 8 email.  *Id.*

### 3.    *March 28, 2022 Complaint*

Holley followed up on his March 8, 2022 email to Morales on March 28, 2022, questioning the status of the "hostile work environment, retaliation, and racial discrimination investigation." CTDI SJ Ex. 20 (ECF No. 30-12 at 229).  Holley also sought to raise additional concerns, first regarding his paternity leave, and second, regarding perceived retaliation by Thompson.  *Id.*  CTDI SJ Ex. 20 (ECF No. 30-12 at 229–30).  Specifically, Holley alleged that even after informing both of his supervisors of his leave, Ackell called him inquiring why he had not been present at work. *Id.*  Regarding Thompson's alleged retaliation, Holley raised that Thompson was "telling other employees that [Holley] abandoned [his] job," and "stated 'I don't why [sic] they won't fire him, he doesn't do anything.'"  *Id.*

Morales responded to Holley's email on April 11, 2022, confirming that she would be investigating Thompson's comments regarding Holley's purported job abandonment and firing, and requesting that Holley provide the names of witnesses to Thompson's statements.  *Id.*  Also in

the email, Morales requested clarification as to whether, following her conversation with Holley on March 7, his initial hostile work environment and retaliation complaints remained retracted. *Id.*; SOAF ¶ 136. Holley did not respond, though he testified that he did not intend to respond until he returned to work from his paternity leave. SOAF ¶¶ 137–38.

### 4. *Plaintiff's Return to Work and June 14, 2022 Complaint*

On June 9, 2022, Holley returned from his paternity leave and continued to struggle with punctuality, appearing late to eighteen of his shifts between his return date and July 6, 2022. SOAF ¶¶ 140–41. Shortly after his return, on June 14, 2022, Holley emailed Morales to convey a new "hostile work environment" complaint, this time relating to an incident involving Young. *Id.* ¶¶ 142–43. Holley alleged that Young became "agitated" with him because he believed Holley had not completed a project assigned by Cavuto, and that this agitation was rooted in Thompson and Young's desire to have Holley fired. *Id.* ¶ 144. According to Holley, Young's "interaction with [him] was a demonstration of the continued harassment and retaliation [he has] to endure to this day," and "fellow coworkers [had] approached [him] and asked why [he's] being treated this way and informed [him] of comments made by leadership such as 'we've tried everything to get him fired.'" CTDI SJ Ex. 20 (ECF No. 30-12 at 228).

Morales held a meeting with Holley on June 21, 2022 in which she offered two additional positions: one second-shift position in CTDI's Swedesboro, New Jersey facility, the other, a first-shift position in CTDI's Logan, New Jersey facility. SOAF ¶ 145. Holley again refused both positions, this time because he preferred a different schedule, did not want to take a cut in pay, and did not want to cross the bridge into New Jersey daily. *Id.* ¶¶ 147–49.

E.    **Plaintiff's Final Warning and Termination**

By July 6, 2022, just over four months after receiving his Second Warning for attendance and despite his paternity leave, Holley incurred 27 additional attendance infractions.  *Id.* ¶ 152.  As a result, Morales met with Holley to issue a Final Warning, which Holley reviewed and signed.  *Id.* ¶ 154.  The Final Warning specified that Holley was "offered five (5) positions in the last (3) months, three (3) of those were twenty-five (25) minutes closer to [Holley's] home, [and] all of which [Holley] declined."  *Id.* ¶ 153.[8]  Morales further stated in the written Final Warning that Holley was "also given the opportunity to come in up to an hour later to accommodate [his] start time but also declined."  *Id.*  Following this meeting, Holley understood that continued lateness would be met with termination.  *Id.* ¶ 155.

On July 7, 2022, Holley was late to work once more.  *Id.* ¶ 156.  Morales alerted Jerry Strain ("Strain"), the "Director of Employee Relations" at CTDI, that she would request termination of Holley's employment the following week, *id.* ¶ 157, and by July 13, 2022, Holley had incurred an additional four lateness violations since his July 6, 2022 Final Warning.  *Id.* ¶ 159.  At that time, Morales reached back out to Strain requesting termination, and Strain agreed, citing Holley's Final Warning and failure to take advantage of CTDI's efforts to accommodate his schedule.  *Id.* ¶ 160.  CTDI terminated Holley's employment on or about July 15, 2022.  *Id.* ¶ 161.

IV.    **PROCEDURAL HISTORY**

Holley filed this lawsuit on November 22, 2023.  ECF No. 2 ("Compl.").  In his Complaint, Holley asserted a claim for discrimination under Title VII of the Civil Rights Act of 1964, citing

---

[8] Based on Holley's deposition testimony, there appears to be a dispute over whether Holley was offered four positions or five, and over whether Holley was offered a start time an hour later to accommodate his schedule, as noted in his Final Warning.  *See* CTDI SJ Ex. 1 (ECF No. 30-12 at 152–54).  However, the Court does not view these disputes as material for purposes of deciding the Motion.

the "discriminatory conduct" he experienced as a "failure to stop harassment," "unequal terms and conditions of my employment," and "retaliation." *Id.* at 4–6.[9]  In his brief statement of facts, Holley asserted that "[t]he Human Resources team as well as my superiors failed to provide me equal accommodations as my white counterparts as it pertains to my work-life-balance.  Upon reporting this discrimination, I was retaliated against and harassed up until the day I was terminated." *Id.* at 6.  Plaintiff further confirmed that he filed a charge with the Equal Employment Opportunity Commission ("EEOC") on August 25, 2022, and the EEOC issued a Right to Sue Letter on August 29, 2023.  *Id.* at 7.  In his request for relief, Plaintiff checked the line item requesting "appropriate injunctive relief, lost wages, liquidated/double damages, front pay, compensatory damages, punitive damages, prejudgment interest, post-judgment interest, and costs, including reasonable attorney fees and expert witness fees." *Id.* at 8.

Just under six months later, CTDI moved to dismiss the Complaint under Federal Rule of Civil Procedure 12(b)(5) for failure to properly serve original process.  ECF No. 10 at 1.  In his response to the Motion to Dismiss, Plaintiff requested alternative service, and the Court ordered service by the U.S. Marshal Service.  ECF Nos. 11 at 2, 13 at 1–2.  On August 6, 2024, CTDI answered Holley's Complaint, and the case proceeded to discovery.  *See* ECF No. 20.

On January 30, 2025, CTDI filed its motion for summary judgment with respect to each of Holley's claims.  ECF No. 30.  CTDI's filing contained a Memorandum in Support, a Concise Statement of Stipulated Facts, Statement of Additional Facts, various declarations from CTDI employees, and 25 exhibits.  *Id.*  A response was due to CTDI's Motion on February 20, 2025. *See* ECF No. 24.  When none was filed, the Court ordered Holley to file a response by March 14,

---

[9] At points in his briefing, Holley refers to claims brought under "parallel state laws," Opp. at 18, and under the "PHRA," Surreply at 2.  However, Holley's complaint indicates that he only seeks relief under "Title VII of the Civil Rights Act of 1964."  *See* Compl. at 4.

2025. ECF No. 32. Holley filed his Opposition on this date, *see* ECF No. 34, citing a handful of exhibits that the Court assumes correspond with the exhibits filed on December 26, 2024 at the close of discovery. *See* ECF No. 29. CTDI filed its Reply on March 20, 2025, *see* ECF No. 35, and Holley his Surreply on April 2, 2025, *see* ECF No. 38.

V.    **DISCUSSION**[10]

A.    **Racial Discrimination**

The Court will grant summary judgment on Holley's claim of racial discrimination. To establish a prima facie claim of race discrimination, Plaintiff must prove that: "(1) [he] is a member of a protected class; (2) [he] was qualified for the position [he] sought to attain or retain; (3) [he] suffered an adverse employment action; and (4) *the action occurred under circumstances that could give rise to an inference of intentional discrimination.*" *Qin v. Vertex, Inc.*, 100 F.4th 458, 473 (3d Cir. 2024) (alterations in original) (quoting *Makky v. Chertoff*, 541 F.3d 205, 214 (3d Cir. 2008)). Should Plaintiff succeed in establishing a prima facie case, it is then incumbent on the Defendant as part of the burden shifting framework "to articulate a legitimate, non-discriminatory reason for the adverse employment action." *Id.* at 474. Once the Defendant meets its burden of production of a legitimate, nondiscriminatory reason for the conduct alleged, the burden then shifts back to Plaintiff to show that the stated "reason is merely pretext for intentional discrimination." *Id.* (internal quotations omitted).

There is no dispute that Holley has satisfied the first two elements of his prima facie case: Holley is a member of a protected class, and he was qualified for his position with CTDI. Instead, in its Motion, CTDI argues that Holley has failed to show a genuine dispute of material fact on

---

[10] Because the Court finds that Defendants are entitled to summary judgment on all claims, it will not reach the question of damages.

prongs three and four.  The Court disagrees with CTDI's argument that Holley has failed to show an adverse employment action but agrees with CTDI that Holley has not shown that the circumstances give rise to an inference of discrimination.

### 1.    *Adverse Employment Action*

Although Holley appears to argue in his briefing that his termination is the relevant adverse employment action in the dispute,[11] the Court agrees with CTDI's read of the Complaint and the EEOC complaint that CTDI's failure to move Holley back to mid shift is the established alleged adverse employment action.  *See* Mtn. at 18.  However, the Court finds that CTDI's denial of a schedule change constitutes an actionable adverse employment action, thereby satisfying prong three of the prima facie case.

An adverse employment action requires a showing that "the employee suffered 'some harm' to a term or condition of employment—in other words, that the employer treated the employee 'worse' because of a protected characteristic."  *Peifer v. Bd. of Prob. & Parole*, 106 F.4th 270, 277 (3d Cir. 2024) (quoting *Muldrow v. City of St. Louis*, 601 U.S. 346, 354 (2024)).[12]

---

[11] Holley appears to raise for the first time in his Opposition that he was wrongfully terminated as a result of racial discrimination and retaliation.  *See* Opp. at 19–21.  However, Holley has consistently disavowed any belief that he was wrongfully terminated.  *See* ECF No. 2 at 5–6, 9; CTDI SJ Ex. 24 (ECF No. 30-12 at 245).  Accordingly, the Court only considers the denial of a shift change as part of its analysis.  *See Carr v. Gillis Associated Indus., Inc.*, 227 F. App'x 172, 176 (3d Cir. 2007) ("District Courts have broad discretion to disallow the addition of new theories of liability at the eleventh hour."); *cf. Dewees v. Haste*, 620 F. Supp. 2d 625, 635 (M.D. Pa. 2009) ("However, Plaintiff has from the outset grounded his claim of retaliation on the *termination of his employment*; the complaint cannot reasonably be read to include a claim for retaliation based upon th*e referral of Plaintiff's potential return to the Prison Board*[,] and to the extent Plaintiff is attempting to expand upon his original allegations through argument in his brief[,] it is impermissible." (emphasis added)), *aff'd*, 386 F. App'x 133 (3d Cir. 2010).

[12] *Muldrow* altered the standard for when an action may constitute an "adverse employment action" for purposes of establishing a prima facie case of discrimination, specifically disavowing the requirement that the harm alleged be "a 'serious and tangible' employment-related harm."  *Peifer*, 106 F.4th at 277 (quoting *Komis v. Sec'y of U.S. Dep't of Lab.*, 918 F.3d 289, 292 (3d Cir. 2019)); *Muldrow*, 601 U.S. at 355.  Considering this significant change in law, CTDI's reference to the

The Supreme Court clearly articulated that the phrase "[t]erms or conditions," in the context of a claim for employment discrimination, includes factors beyond those that are "economic or tangible" and apply beyond a "narrow contractual sense." *Muldrow*, 601 U.S. at 354.

While it is apparent to the Court that Holley viewed a later shift as preferable to the first shift he was assigned to for personal reasons—*i.e.*, to accommodate his childcare schedule— Holley's March 1, 2022 complaint to Human Resources indicates that CTDI's denial of the shift-change request ultimately resulted in him feeling as though he was "being targeted," "intentionally forced out," and "put in a situation that seem[ed] as though it [was] meant to cause [him] to be terminated" due to the "continuous[]" discipline he received for being late. *See* CTDI SJ Ex. 2 (ECF No. 30-12 at 171). Holley complained that he had "never experienced the treatment that [he had] experienced in the last year" prior. *Id.* In essence, a reasonable juror could find that Holley's "conditions" of employment were altered by the growing feeling of being "targeted" for termination. Given *Muldrow*'s "some harm" standard, and the requirement that the Court draw all reasonable inferences in Holley's favor, the Court finds that Holley has offered enough evidence from which a reasonable juror could infer that he suffered "some" employment-related harm when he was denied a change back to his original shift. The adverse employment action prong is therefore satisfied.

### 2. *Inference of Discrimination*

Even in light of the Court's finding that Holley has adequately shown that he suffered an adverse employment action, Holley has failed to show that such an adverse employment action occurred under circumstances giving rise to an inference of intentional discrimination. To meet

---

"serious and tangible" standard in its Motion begs correction and need be remedied moving forward. *See* Mtn. at 19.

the fourth element of the prima facie case, "a plaintiff may either (1) introduce evidence of comparators (i.e., similarly situated employees who (a) were not members of the same protected class and (b) were treated more favorably under similar circumstances); or (2) rely on circumstantial evidence that otherwise shows a causal nexus between his membership in a protected class and the adverse employment action." *Greene v. V.I. Water & Power Auth.*, 557 F. App'x 189, 195 (3d Cir. 2014).

### i.    Comparator Evidence

Holley points to a single comparator, Nate Johnson, as the only support for his prima facie case of racial discrimination.  "[C]omparator employees need not be identical but must be similarly situated in all material respects."  *Qin*, 100 F.4th at 474 (internal quotations omitted).  While the relevant factors are case-specific, effective demonstration of a comparator often includes a showing that the plaintiff and comparator "dealt with the same supervisor, [were] subject to the same standards, and [] engaged in similar conduct **without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them**."  *Lesiv v. Ill. Cent. R.R. Co.*, 39 F.4th 903, 919 (7th Cir. 2022) (emphasis added) (quoted in *Grant v. U.S. Post Off.*, No. 22-2933, 2023 WL 3816524, at *2 (3d Cir. June 5, 2023)).  "Whether comparators are similarly situated is generally a question of fact for the jury," but summary judgment is nevertheless appropriate "where there is no evidence from which a jury could conclude the parties were similarly situated."  *Abdul-Latif v. Cnty. of Lancaster*, 990 F. Supp. 2d 517, 526 (E.D. Pa. 2014).

Holley maintains that, based on the e-mails found in the shared inbox, Johnson engaged in similar misconduct, namely, committing attendance infractions and departing his workstation without authorization.  SOAF ¶¶ 109–22.  But, according to Holley, Johnson was granted

accommodations for his nursing school schedule while Holley was not for childcare. *Id.* However, considering all facts in the light most favorable to Holley, the Court does not find Johnson to be a proper comparator for purposes of establishing the fourth prong of the prima facie case. While it may be the case that Holley and Johnson were both full-time employees in the same role and each received work from Thompson, there are significant "differentiating" circumstances such that Johnson's misconduct cannot effectively be compared to Holley's. First and foremost, by the time Holley requested a schedule accommodation, he already had a significant disciplinary record with CTDI (including two previous Final Warnings), while Johnson had none. *Id.* ¶¶ 43, 50, 109–22. Further, Holley incurred a multitude of attendance violations even while working the schedule that he eventually sought to return to, dating back to 2015. *See, e.g.*, *id.* ¶¶ 39–40, 87. Further, while Johnson's misconduct was limited to timekeeping and tardiness infractions,[13] Holley's misconduct was not limited in the same way. Indeed, Holley admitted that he was disciplined twice, in June and September 2021, for leaving his post for extended periods of time, with one of those unauthorized breaks amounting to nearly four hours away from his post to work his side job selling and auctioning sneakers. *Id.* ¶¶ 51, 63–82. Based on the record, it was Holley's leaving his post that caused his shift to be changed, not his timeliness infractions. *Id.* ¶¶ 89–90. These conduct issues, rather than attendance issues, "distinguish" Holley's conduct from Johnson's. Therefore, Holley fails to establish a proper comparator for purposes of fulfilling the fourth prong of the prima facie case.

---

[13] Even if it is true that Holley witnessed Johnson leaving his workstation, Holley does not allege that the supervisors relevant here *knew* that Johnson left his workstation, and Young, Thompson, and Cavuto each made a sworn statement that they did not have knowledge of Johnson taking any extended breaks or leaving his work post for extended periods of time. SOAF ¶ 118.

ii.    Other Circumstantial Evidence

The Court also finds no evidence in the record that would lead a reasonable juror to infer discriminatory intent.  Holley testified during his deposition that he was not aware of Colello, Young, Morales, Cavuto, or Gomez making "any race-related comments about him."  *See id.* ¶¶ 163–67, 169.  And, at most, Holley's testimony was inconsistent on whether Thompson had ever made a race-based comment toward him.  *Compare* CTDI SJ Ex. 1 (ECF No. 30-12 at 12) ("Q. And what about Paul Thompson? A. Racial comments towards me? No. But he has made racial comments. Q. Did you report that? A. No.") *with* CTDI SJ Ex. 1 (ECF No. 30-12 at 163) ("Q. Okay. Paul Thompson, a supervisor of yours when you worked at CTDI, do you know who that is? A. Yes. Q. Did — has he ever made a race-based comment to you? A. Yes.").  Even construing the inconsistency in the light most favorable to Holley, the Court cannot conclude that this testimony alone is sufficient for a reasonable juror to find in Holley's favor on this prong.  The record is otherwise devoid of any circumstantial information that could give rise to an inference of discrimination.  Accordingly, the Court will grant summary judgment in favor of CTDI on Holley's race discrimination claim.[14]

B.    **Hostile Work Environment**

The Court will also grant summary judgment in favor of CTDI on Holley's hostile work environment claim.  Holley's hostile work environment claim stems from three interactions: (1)

---

[14] For avoidance of doubt, the Court finds that CTDI has offered a legitimate, nondiscriminatory reason for the denial of the shift change request—that Holley needed to be directly supervised during his shift due to the previous instances of him leaving his post without permission. *See, e.g.*, SOAF ¶ 90.  The Court further finds that Holley has unsuccessfully rebutted this legitimate nondiscriminatory reason, as he has not offered any record evidence to show that this reason was merely pretext for discrimination.  As discussed above, statements made in briefing "are not evidence and cannot by themselves create a factual dispute sufficient to defeat a summary judgment motion." *Jersey Cent. Power & Light Co.*, 772 F.2d at 1109–10.

Young's November 9, 2021 comment that if it were up to him, Holley would be fired; (2) Thompson's March 2022 comment that Holley had abandoned his job and would be fired; and (3) Young's June 2022 "agitation" at Holley over a work assignment. *Id.* ¶¶ 84, 132, 143. A successful hostile work environment claim must show that 1) the plaintiff "suffered intentional discrimination" because of his protected characteristic, (2) "the discrimination was severe or pervasive," (3) "the discrimination detrimentally affected the plaintiff," (4) "the discrimination would detrimentally affect a reasonable person in like circumstances," and (5) "*respondeat superior* liability" is present. *Mandel v. M & Q Packaging Corp.*, 706 F.3d 157, 167 (3d Cir. 2013). Relevant to the analysis are factors such as "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Qin*, 100 F.4th at 471.

## 1.    *Intentional Discrimination Based on Race*

Holley fails to satisfy the first prong of the hostile work environment test. "Title VII does not prohibit all verbal or physical harassment in the workplace; it is directed only at discrimination because of" a protected characteristic. *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998) (internal quotations omitted). Here, the record is devoid of any indication that the comments made were racially charged. First, Holley admits that Young never made a race-based comment to him, thereby undermining any claim that Young's comment about firing Holley was "because of" his race. SOAF ¶ 164. And, as discussed *supra* Section V.A.2, Holley's inconsistent testimony on Thompson making a race-based comment toward him cannot alone sustain a claim that Thompson's *March 2022* comment was made "because of" Holley's race. In fact, the March 2022 comment—which Holley alleged evidenced a hostile work environment—had nothing to do with his race. SOAF ¶ 132.

Second, even assuming Holley also claims that the purported retaliation he faced after reporting discrimination in March and June 2022 was so severe as to create a hostile work environment, he provides no evidence that Thompson was aware of his complaints to Morales about discrimination.  As for Young's June 2022 "agitation," there is no evidence in the record connecting this negative treatment to Holley's complaints of discrimination.

Without evidence indicating that these statements were made "because of" Holley's race, Holley cannot fulfill the first prong of the hostile work environment test.

2.    ***Severe and Pervasive***

Holley also fails to satisfy the second prong of the hostile work environment test, *i.e.*, that the discrimination was severe or pervasive.  "A hostile work environment is actionable under Title VII only if it is so severe and pervasive that it alters the conditions of the victim's employment and creates an abusive working environment."  *Greer v. Mondelez Glob., Inc.*, 590 F. App'x 170, 173 (3d Cir. 2014) (internal quotations omitted) (citing *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 270 (2001)).

Considering the complained of behavior in totality, the Court finds that the alleged harassment does not rise to the level of severe or pervasive.  Unless they are "extremely serious," "offhand[] comments and isolated incidents . . . are not sufficient to sustain a hostile work environment claim."  *Watkins v. Pa. Dep't of Corr.*, No. 22-1426, 2023 WL 5925896, at *4 (3d Cir. Sept. 12, 2023) (quoting *Caver v. City of Trenton*, 420 F.3d 243, 262 (3d Cir. 2005)).  At most, the record indicates that each comment by Young and Thompson was an offhand statement relating to Holley's workplace conduct.  Although intentional jabs or musings about Holley being fired may have been distressing to Holley, "it is insufficient to show . . . that the conduct was such that it rendered Plaintiff's worklife unpleasant or uncomfortable."  *Palmer v. Fed. Express Corp.*, 235

23

F. Supp. 3d 702, 719 (W.D. Pa. 2016).  Similarly, while Young's alleged agitation toward Holley in June 2022 "may have been unprofessional, embarrassing to Plaintiff, or made him feel uncomfortable," no reasonable juror could conclude that Young expressing his "agitation" amounted to severe and pervasive *discriminatory* conduct. *Lulis v. Barnhart*, 252 F. Supp. 2d 172, 178 (E.D. Pa. 2003).[15]

Ultimately, "personality conflicts between employees are not the business of the federal courts." *Hoist v. New Jersey*, No. CIV.A. 12-5370 FLW L, 2015 WL 4773275, at *22 (D.N.J. Aug. 13, 2015), *aff'd*, 642 F. App'x 169 (3d Cir. 2016) (internal quotations omitted).  It is apparent from the record that tensions arose between Holley and building supervisors based on Holley's ongoing attendance and work conduct issues.  However, the record indicates that the alleged hostile comments were infrequent, did not "unreasonably interfere with [Holley's] work performance," and did not amount to ongoing physical threats or humiliation based on Holley's race. *Qin*, 100 F.4th at 471.

Accordingly, the Court will grant summary judgment on Holley's hostile work environment claim, as there is insufficient evidence from which a reasonable jury could find that Holley was subject to "severe and pervasive" *discriminatory* conduct which "alter[ed] the conditions of [his] employment" and "create[ed] an abusive working environment." *Greer, Inc.*, 590 F. App'x at 173 (internal quotations omitted).

---

[15] Holley's June 14, 2022 complaint to Morales also states "fellow coworkers have approached me and asked why I'm being treated this way and informed me of comments made by leadership such as 'we've tried everything to get him fired.'"  CTDI SJ Ex. 20 (ECF No. 30-12 at 228).  Again, without further evidence that such comments were made based on Holley's race, this record evidence does not create a genuine dispute of material fact.

C.    **Retaliation**

Holley fails to establish a prima facie case of retaliation, and the Court will grant summary judgment in CTDI's favor on this claim.  To demonstrate a prima facie *case* of retaliation, a plaintiff must show: "(1) that he engaged in protected conduct; (2) that he was subject to an adverse employment action subsequent to such activity; and (3) that a causal link exists between the protected activity and the adverse action."  *Qin*, 100 F.4th at 475 (quoting *Barber v. CSX Distrib. Servs.*, 68 F.3d 694, 701 (3d Cir. 1995)).  "If the [p]laintiff makes this showing, the burden shifts to the employer to advance a legitimate, non-retaliatory reason for its conduct."  *Smith v. City of Atl. City,* 138 F.4th at 775 (quoting *Moore v. City of Phila.*, 461 F.3d 331, 342 (3d Cir. 2006)) (internal quotations omitted).  If the employer advances a legitimate, non-retaliatory reason, "the burden shifts back to the [p]laintiff to convince the factfinder both that the employer's proffered explanation was false, and that retaliation was the real reason for the adverse employment action."  *Id.*

Here, there is no dispute that Holley made three complaints of discrimination to Morales: one on March 1, 2022, one on March 28, 2022, and one on June 14, 2022, fulfilling the protected activity prong.  *See* SOAF ¶¶ 107, 131, 142.  CTDI's arguments focus on whether Holley has presented evidence of a materially adverse action, and whether a reasonable jury could infer a causal connection between the protected activity and purported adverse action.

1.    ***Adverse Action***

CTDI first argues that, as a matter of law, any alleged adverse action taking place prior to March 1, 2022—the date of Plaintiff's initial complaint—cannot be retaliatory.  Mtn. at 25.  The Court agrees.

In his March 1, 2022 email to Morales, Holley conveyed his belief that he was being retaliated against based on the September 2021 incident in which he left CTDI's premises for an extended period. SOAF ¶ 112. However, until that point, Holley had not engaged in any protected activity. For purposes of establishing a prima facie case of retaliation, any alleged adverse action must have been undertaken "either after or contemporaneous with the employee's protected activity." *Canada v. Samuel Grossi & Sons, Inc.*, 49 F.4th 340, 346 (3d Cir. 2022). Therefore, to the extent that Holley believes that his initial shift change constituted an adverse employment action, this argument fails.[16]

The remaining alleged adverse employment action, then, is CTDI's refusal to move Holley back to his original mid shift position. "An adverse action must be materially adverse, such that it is harmful to the point that it could well dissuade a reasonable worker from making or supporting a charge of discrimination." *Smith*, 138 F.4th at 775 (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 57 (2006)). In *Burlington Northern*, "the Supreme Court provided examples of retaliatory actions that qualified as materially adverse, which included changes that had an 'enormous' impact on an employee's ability to work, exclusion from professional advancement opportunities, and re-assignment to less prestigious duties." *Goodman v. Norristown Area Sch. Dist.*, No. 20-CV-1682, 2021 WL 6063122, at *16 (E.D. Pa. Dec. 22, 2021) (citing *Burlington N.*, 548 U.S. at 69, 71).

The Court can only discern from the record Holley's belief that CTDI's refusal to move him back to mid shift had some impact on his "ability to work," that is, on getting to work on-time.

---

[16] During his deposition, Holley testified that he was not "claiming CTDI retaliated against" him in any way aside from the claim that CTDI failed to "chang[e] [his] schedule to accommodate [his] childcare needs." CTDI SJ Ex. 1 (ECF No. 30-12 at 9). The Court merely seeks to clarify Holley's briefing.

However, even assuming this to be true, the record does not point to this impact being so "enormous" that it rises to the level of a materially adverse employment action.[17]  First, Holley experienced issues with timeliness and attendance prior to the shift change, indicating that CTDI's refusal to move him back to mid shift was unlikely to be the driving force in his subsequent attendance issues.  *See, e.g.*, *id.* ¶¶ 39–40, 87.  Second, Holley testified that his girlfriend's mother was available to babysit when he moved to first shift.  CTDI SJ Ex. 1 (ECF No. 30-12 at 166).  Finally, Holley testified that looking into alternate childcare arrangements did not occur to him when he moved to first shift, further demonstrating the impact of Holley's own choices on his attendance record.  CTDI SJ Ex. 1 (ECF No. 30-12 at 95–99).  In other words, the record shows that CTDI's refusal to switch Holley back to mid shift did not have an "enormous" impact on Holley's ability to work—instead, it was Holley's own choices which had this impact.  Accordingly, Holley has failed to show an adverse employment action for purposes of his prima facie case of retaliation.

  2. ***Causation***

   Holley has also failed to set forth any evidence from which a reasonable juror could infer a causal connection between his complaints to Morales and CTDI's refusal to move him back to mid shift.  The causal connection may be displayed using "a broad array of evidence," such as "inconsistent explanation[s] for taking an adverse employment action, a pattern of antagonism, or temporal proximity unusually suggestive of retaliatory motive."  *Carvalho-Grevious v. Del. State*

---

[17] The Supreme Court made clear in *Muldrow* that its decision did not alter the "materially adverse" standard relevant to Title VII retaliation claims and reiterated that "[a]n action causing less serious harm will not deter Title VII enforcement and so falls outside the purposes of the ban on retaliation."  *Muldrow*, 601 U.S. at 348.

*Univ.*, 851 F.3d 249, 260 (3d Cir. 2017) (cleaned up).  "These are not the exclusive ways to show causation, as the proffered evidence, looked at as a whole, may suffice to raise the inference."  *Id.*

First and foremost, to the extent that Holley asserts that his retaliation claim is based on Thompson or Cavuto's specific failure to move him back to mid shift, both declared under oath that they did not know that Holley made complaints of discrimination to Morales.  *See* SOAF ¶ 114(a).  Without knowledge of the protected activity on the part of a decision-maker, the causal connection between the protected activity and the alleged adverse employment action is lacking. *See Giuseffi v. Sec'y United States Dep't of Homeland Sec.*, 810 F. App'x 96, 101 (3d Cir. 2020) ("No prior knowledge means no causation.").  Holley did not rebut the sworn declaration testimony.

Moreover, Holley repeatedly requested a shift change *prior* to his first raising complaints of discrimination in March 2022, and his requests were denied.  *See* CTDI SJ Ex. 2 (ECF No. 30-12 at 171).  Indeed, Holley's shift was not adjusted at any point between the move to first shift in November 2021 and his first complaint on March 1, 2022.  As CTDI acknowledges, "[a]n employee cannot insulate themselves from adverse actions by raising claims of discrimination after engaging in non-protected conduct that was the basis for the employer's adverse action."  *Scruggs v. Phila. Hous. Auth.*, No. 22-cv-510, 2024 WL 388391, at *12 (E.D. Pa. Jan. 31, 2024) (citing *Curay-Cramer v. Ursuline Acad. of Wilmington, Del., Inc.*, 450 F.3d 130, 137 (3d Cir. 2006)). Prior to the alleged retaliatory conduct, Holley was on the first shift for months, and his supervisor rejected any requests to move him back to mid shift.  *See* CTDI SJ Ex. 2 (ECF No. 30-12 at 171). In other words, Holley's workplace misconduct was "recognized prior to engaging in protected activity" and shift change requests were denied prior to any complaints being made to Human Resources.  *Ross v. Cont'l Tire of Americas, LLC*, No. CIV.A. 12-2631, 2013 WL 1628193, at *6

(E.D. Pa. Apr. 16, 2013), *aff'd sub nom., Ross v. Gilhuly*, 755 F.3d 185 (3d Cir. 2014).  Therefore, the Court finds that causation cannot be inferred under the circumstances.  *Id.*

Finally, as to whether Holley experienced a "pattern of antagonism," the Court does not find the record to support that any purported antagonism Holley experienced following March 1, 2022 resulted from his protected activity.  Even assuming that the "continuous[]" scrutiny of his attendance and performance Holley experienced after making his complaint constituted a "pattern," Holley's attendance and tardiness were scrutinized for *years* prior to him making his first complaint.  CDTI SJ Ex. 20 (ECF No. 30-12 at 230); SOAF ¶¶ 39–106.  This fact belies any inference of causality.

Holley also argues in his opposition that he experienced "dismissive" behavior from Morales following his first complaint and "no effort was made to address his concerns."  Opp. at 21.  The record directly contradicts these arguments.  It is undisputed that Morales maintained communication with Holley regarding his complaints and indicated that she would investigate Holley's March 28, 2022 complaint, but Holley didn't respond to her email requesting further information.  SOAF ¶¶ 107–138.  It is similarly undisputed that CTDI offered Holley different positions at various CTDI locations in an attempt to accommodate his childcare schedule.  *Id.* ¶¶ 124–27, 145–50.  Holley turned down every offer for various reasons: travel time, a decrease in pay, or unpreferred working hours.  *Id.*

Finally, and to the extent that Holley argues that Young's "agitation" toward him in June 2022 further evidenced a pattern of antagonism, *see* CDTI SJ Ex. 20 (ECF No. 30-12 at 228), Holley provides no record evidence upon which a reasonable juror could conclude that the agitation was causally related to his complaints of discrimination rather than his workplace conduct.

3.    ***Pretext***

For avoidance of doubt, the Court will further address Holley's statement that CTDI's reason for not moving Holley back to mid shift is pretextual.  In his Surreply, Holley argues that "Defendant falsely claims the shift change was required because Plaintiff's work moved locations. In fact, that work did not move until 6–8 months later, and Plaintiff continued doing the same job on the new schedule, often unable to complete it because the workload arrived after 12:00 p.m., after his new shift had ended."  Surreply at 2.  The Court finds that this point does not present a legitimate dispute of material fact.  First, CTDI does not claim that Holley's shift was changed because Plaintiff's work moved locations.  Instead, CTDI asserts that Holley's shift was changed so that his supervisors could oversee his entire shift, a point underscored by the record.  SOAF ¶¶ 79, 90, 129.  This reasoning did not change when Holley began making complaints to Human Resources.  Regardless of whether the work necessitating the mid shift remained after Holley was moved to first shift, the sworn statement by Morales indicates that "CTDI did not want to move Mr. Holley back to his prior shift because his supervisors could not monitor his conduct."  Morales Decl. ¶ 32 (ECF No. 30-6 at 5).  Therefore, Holley's pretext argument is a straw man, and Holley has failed to show that CTDI's stated reason for denying the shift change—that is, wanting to monitor Holley's conduct during the first shift—was pretext for retaliation.[18]

---

[18] Holley also asserts in his surreply that "CTDI tolerated his attendance record for over a decade, and discipline only escalated after he reported racial discrimination and retaliation in late 2022," and that "shortly after that complaint, CTDI suddenly issued multiple write ups and a Final Warning—despite no significant change in behavior."  Surreply at 1.  However, this argument is unsupported by the record, as CTDI did not "tolerate[] his attendance record for over a decade," but continuously wrote him up for being late and issued two Final Warnings prior to him making any charge of discrimination to HR.  SOAF ¶¶ 43, 50–106.  Further, there was nothing "sudden" about the issuance of multiple write-ups and the Final Warning following the June 2022 complaint. Holley had "accumulated an additional twenty-seven attendance infractions since he was issued his Second Warning [for] Attendance on February 28, 2022," with eighteen of those lates taking place between June 9, 2022 and July 6, 2022.  Mtn. at 10; SOAF ¶ 152; CTDI SJ Ex. 21 (ECF No.

Accordingly, Holley has failed to state a prima facie case of retaliation, and summary judgment will be granted as to his retaliation claim.

## VI.    CONCLUSION

For the reasons stated above, Defendant's Motion for Summary Judgment (ECF No. 30) is **GRANTED in full**, and the case is **DISMISSED**.  An appropriate order will follow.


**BY THE COURT:**

**/s/ CHAD F. KENNEY**

_____

**CHAD F. KENNEY, J.**

---

30-12 at 233).  Morales issued the Final Warning on July 6, 2022, and Holley then proceeded to arrive late to his shift not only the very next day, but three additional days thereafter.  SOAF ¶¶ 152, 156, 159.  Holley's pretext argument therefore does not pass muster.